Kathleen BERG, et al., Respondents,

v.

Rodney A. WILEY, et al., Appellants,

Bonnie Osterberg, et al., Defendants.

No. 47317.

Supreme Court of Minnesota.

March 17, 1978.

Leonard, Street & Deinard and Lowell J. Noteboom and David C. Zalk, Minneapolis, for appellants.

Mannikko & Swenson, Joseph L. Mannikko, Robert P. Larson, Wayzata, Robert G. Share, Minneapolis, for respondents.

Heard before ROGOSHESKE, PETERSON and WAHL, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendant landlord, Wiley Enterprises, Inc., and defendant Rodney A. Wiley (hereafter collectively referred to as Wiley) appeal from a judgment upon a jury verdict awarding plaintiff tenant, A Family Affair

Restaurant, Inc., damages for wrongful eviction from its leased premises. The issues for review are whether the evidence was sufficient to support the jury's finding that the tenant did not abandon or surrender the premises and whether the trial court erred in finding Wiley's reentry forcible and wrongful as a matter of law. We hold that the jury's verdict is supported by sufficient evidence and that the trial court's determination of unlawful entry was correct as a matter of law, and affirm the judgment.

On November 11, 1970, Wiley, as lessor and tenant's predecessor in interest as lessee, executed a written lease agreement letting land and a building in Osseo, Minnesota, for use as a restaurant. The lease provided a 5-year term beginning December 1, 1970, and specified that the tenant agreed to bear all costs of repairs and remodeling, to "make no changes in the building structure" without prior written authorization from Wiley, and to "operate the restaurant in a lawful and prudent manner." Wiley also reserved the right "at [his] option [to] retake possession" of the premises "[s]hould the Lessee fail to meet the conditions of this Lease."[1] In early 1971, plaintiff Kathleen Berg took assignment of the lease from the prior lessee, and on May 1, 1971, she opened "A Family Affair Restaurant" on the premises. In January 1973, Berg incorporated the restaurant and assigned her interest in the lease to "A Family Affair Restaurant, Inc." As sole shareholder of the corporation, she alone continued to act for the tenant.

The present dispute has arisen out of Wiley's objection to Berg's continued remodeling of the restaurant without procuring written permission and her consequent operation of the restaurant in a state of disrepair with alleged health code violations. Strained relations between the parties came to a head in June and July 1973. In a letter dated June 29, 1973, Wiley's attorney charged Berg with having breached lease items 5 and 6 by making changes in the building structure without written authorization and by operating an unclean kitchen in violation of health regulations. The letter demanded that a list of eight remodeling items be completed within 2 weeks from the date of the letter, by Friday, July 13, 1973, or Wiley would retake possession of the premises under lease item 7. Also, a June 13 inspection of the restaurant by the Minnesota Department of Health had produced an order that certain listed changes be completed within specified time limits in order to comply with the health code. The major items on the inspector's list, similar to those listed by Wiley's attorney, were to be completed by July 15, 1973.

During the 2-week deadline set by both Wiley and the health department, Berg continued to operate the restaurant without closing to complete the required items of remodeling. The evidence is in dispute as to whether she intended to permanently close the restaurant and vacate the premises at the end of the 2 weeks or simply close for about 1 month in order to remodel to comply with the health code. At the close of business on Friday, July 13, 1973, the last day of the 2-week period, Berg dismissed her employees, closed the restaurant, and placed a sign in the window saying "Closed for Remodeling." Earlier that day, Berg testified, Wiley came to the premises in her absence and attempted to change the locks. When she returned and asserted her right to continue in possession, he complied with

---

1. The provisions of the lease pertinent to this case provide: "Item # 5 The Lessee will make no changes to the building structure without first receiving written authorization from the Lessor. The Lessor will promptly reply in writing to each request and will cooperate with the Lessee on any reasonable request.

"Item # 6 The Lessee agrees to operate the restaurant in a lawful and prudent manner during the lease period.

"Item # 7 Should the Lessee fail to meet the conditions of this Lease the Lessor may at their option retake possession of said premises. In any such event such act will not relieve Lessee from liability for payment the rental herein provided or from the conditions or obligations of this lease."

her request to leave the locks unchanged. Berg also testified that at about 9:30 p. m. that evening, while she and four of her friends were in the restaurant, she observed Wiley hanging from the awning peering into the window. Shortly thereafter, she heard Wiley pounding on the back door demanding admittance. Berg called the county sheriff to come and preserve order. Wiley testified that he observed Berg and a group of her friends in the restaurant removing paneling from a wall. Allegedly fearing destruction of his property, Wiley called the city police, who, with the sheriff, mediated an agreement between the parties to preserve the status quo until each could consult with legal counsel on Monday, July 16, 1973.

Wiley testified that his then attorney advised him to take possession of the premises and lock the tenant out. Accompanied by a police officer and a locksmith, Wiley entered the premises in Berg's absence and without her knowledge on Monday, July 16, 1973, and changed the locks. Later in the day, Berg found herself locked out. The lease term was not due to expire until December 1, 1975. The premises were re-let to another tenant on or about August 1, 1973. Berg brought this damage action against Wiley and three other named defendants, including the new tenant, on July 27, 1973.[2] A second amended complaint sought damages for lost profits, damage to chattels, intentional infliction of emotional distress, and other tort damages based upon claims in wrongful eviction, contract, and tort. Wiley answered with an affirmative defense of abandonment and surrender and counterclaimed for damage to the premises and indemnification on mechanics lien liability incurred because of Berg's remodeling. At the close of Berg's case, all defendants other than Rodney A. Wiley and Wiley

Enterprises, Inc., were dismissed from the action. Only Berg's action for wrongful eviction and intentional infliction of emotional distress and Wiley's affirmative defense of abandonment and his counterclaim for damage to the premises were submitted by special verdict to the jury. With respect to the wrongful eviction claim, the trial court found as a matter of law that Wiley did in fact lock the tenant out, and that the lockout was wrongful.

The jury, by answers to the questions submitted, found no liability on Berg's claim for intentional infliction of emotional distress and no liability on Wiley's counterclaim for damages to the premises, but awarded Berg $31,000 for lost profits and $3,540 for loss of chattels resulting from the wrongful lockout. The jury also specifically found that Berg neither abandoned nor surrendered the premises. The trial court granted Wiley's post-trial motion for an order decreeing that Berg indemnify Wiley for any mechanics lien liability incurred due to Berg's remodeling by way of set-off from Berg's judgment and ordered the judgment accordingly amended.

On this appeal, Wiley seeks an outright reversal of the damages award for wrongful eviction, claiming insufficient evidence to support the jury's finding of no abandonment or surrender and claiming error in the trial court's finding of wrongful eviction as a matter of law.

■ The first issue before us concerns the sufficiency of evidence to support the jury's finding that Berg had not abandoned or surrendered the leasehold before being locked out by Wiley. Viewing the evidence to support the jury's special verdict in the light most favorable to Berg, as we must,[3] we hold it amply supports the jury's finding of no abandonment or surrender of the

2. Proceedings in this damage action were suspended for the duration of a separate unlawful detainer action in which Berg sought to recover possession of the premises under Minn.St. c. 566. In that action, this court reversed a judgment awarding possession of the premises to Berg, holding that an unlawful detainer action under Minn.St. c. 566 was not available to a tenant against his landlord. *Berg v. Wiley,* 303 Minn. 247, 226 N.W.2d 904 (1975). An amended complaint in this damage action was served on May 6, 1974. A second amended complaint was served on December 12, 1975, and proceedings were resumed.

3. *Kuehl v. National Tea Co.,* Minn., 245 N.W.2d 235 (1976).

premises. While the evidence bearing upon Berg's intent was strongly contradictory, the jury could reasonably have concluded, based on Berg's testimony and supporting circumstantial evidence, that she intended to retain possession, closing temporarily to remodel. Thus, the lockout cannot be excused on ground that Berg abandoned or surrendered the leasehold.

The second and more difficult issue is whether Wiley's self-help repossession of the premises by locking out Berg was correctly held wrongful as a matter of law.

■ Minnesota has historically followed the common-law rule that a landlord may rightfully use self-help to retake leased premises from a tenant in possession without incurring liability for wrongful eviction provided two conditions are met: (1) The landlord is legally entitled to possession, such as where a tenant holds over after the lease term or where a tenant breaches a lease containing a reentry clause; and (2) the landlord's means of reentry are peaceable. *Mercil v. Broulette,* 66 Minn. 416, 69 N.W. 218 (1896). Under the common-law rule, a tenant who is evicted by his landlord may recover damages for wrongful eviction where the landlord either had no right to possession or where the means used to remove the tenant were forcible, or both. See, e. g., *Poppen v. Wadleigh,* 235 Minn. 400, 51 N.W.2d 75 (1952); *Sweeney v. Meyers,* 199 Minn. 21, 270 N.W. 906 (1937); *Lobdell v. Keene,* 85 Minn. 90, 88 N.W. 426 (1901). See, also, Minn.St. 566.01 (statutory cause of action where entry is not "allowed by law" or, if allowed, is not made "in a peaceable manner").

■ Wiley contends that Berg had breached the provisions of the lease, thereby entitling Wiley, under the terms of the lease, to retake possession, and that his

repossession by changing the locks in Berg's absence was accomplished in a peaceful manner. In a memorandum accompanying the post-trial order, the trial court stated two grounds for finding the lockout wrongful as a matter of law: (1) It was not accomplished in a peaceable manner and therefore could not be justified under the common-law rule, and (2) any self-help reentry against a tenant in possession is wrongful under the growing modern doctrine that a landlord must always resort to the judicial process to enforce his statutory remedy against a tenant wrongfully in possession. Whether Berg had in fact breached the lease and whether Wiley was hence entitled to possession was not judicially determined. That issue became irrelevant upon the trial court's finding that Wiley's reentry was forcible as a matter of law because even if Berg had breached the lease, this could not excuse Wiley's nonpeaceable reentry. The finding that Wiley's reentry was forcible as a matter of law provided a sufficient ground for damages, and the issue of breach was not submitted to the jury.[4]

In each of our previous cases upholding an award of damages for wrongful eviction, the landlord had in fact been found to have no legal right to possession. In applying the common-law rule, we have not before had occasion to decide what means of self-help used to dispossess a tenant in his absence will constitute a nonpeaceable entry, giving a right to damages without regard to who holds the legal right to possession. Wiley argues that only actual or threatened violence used against a tenant should give rise to damages where the landlord had the right to possession. We cannot agree.

It has long been the policy of our law to discourage landlords from taking the law

---

4. Although not affirmatively pleaded by Wiley, the issue of whether Berg had breached the lease and Wiley's waiver thereof was litigated by consent with evidence presented by both parties, and Wiley on post-trial motion alleged as error the trial court's failure to submit the issue to the jury. We observe that upon the conflicting testimony in the record before us we would be unable to find as a matter of law

that Berg breached the lease and that Wiley did not waive any claimed breach. Thus, even assuming that Wiley's reentry could be found peaceable, we would be unable to resolve this dispute in Wiley's favor under the common-law rule, as he urges, without a remand to determine the issue of breach, which the parties do not desire.

into their own hands, and our decisions and statutory law have looked with disfavor upon any use of self-help to dispossess a tenant in circumstances which are likely to result in breaches of the peace. We gave early recognition to this policy in *Lobdell v. Keene,* 85 Minn. 90, 101, 88 N.W. 426, 430 (1901), where we said:

> "The object and purpose of the legislature in the enactment of the forcible entry and unlawful detainer statute was to prevent those claiming a right of entry or possession of lands from redressing their own wrongs by entering into possession in a violent and forcible manner. All such acts tend to a breach of the peace, and encourage high-handed oppression. The law does not permit the owner of land, be his title ever so good, to be the judge of his own rights with respect to a possession adversely held, but puts him to his remedy under the statutes."

To facilitate a resort to judicial process, the legislature has provided a summary procedure in Minn.St. 566.02 to 566.17 whereby a landlord may recover possession of leased premises upon proper notice and showing in court in as little as 3 to 10 days. As we recognized in *Mutual Trust Life Ins. Co. v. Berg,* 187 Minn. 503, 505, 246 N.W. 9, 10 (1932), "[t]he forcible entry and unlawful detainer statutes were intended to prevent parties from taking the law into their own hands when going into possession of lands and tenements * * *." To further discourage self-help, our legislature has provided treble damages for forcible evictions, §§ 557.08 and 557.09, and has provided additional criminal penalties for intentional and unlawful exclusion of a tenant. § 504.25. In *Sweeney v. Meyers, supra,* we allowed a business tenant not only damages for lost profits but also punitive damages against a landlord who, like Wiley, entered in the tenant's absence and locked the tenant out.

In the present case, as in Sweeney, the tenant was in possession, claiming a right to continue in possession adverse to the landlord's claim of breach of the lease, and had neither abandoned nor surrendered the premises. Wiley, well aware that Berg was asserting her right to possession, retook possession in her absence by picking the locks and locking her out. The record shows a history of vigorous dispute and keen animosity between the parties. Upon this record, we can only conclude that the singular reason why actual violence did not erupt at the moment of Wiley's changing of the locks was Berg's absence and her subsequent self-restraint and resort to judicial process. Upon these facts, we cannot find Wiley's means of reentry peaceable under the common-law rule. Our long-standing policy to discourage self-help which tends to cause a breach of the peace compels us to disapprove the means used to dispossess Berg. To approve this lockout, as urged by Wiley, merely because in Berg's absence no actual violence erupted while the locks were being changed, would be to encourage all future tenants, in order to protect their possession, to be vigilant and thereby set the stage for the very kind of public disturbance which it must be our policy to discourage.

Consistent with our conclusion that we cannot find Wiley's means of reentry peaceable under the common-law rule is *Gulf Oil Corp. v. Smithey,* 426 S.W.2d 262 (Tex.Civ. App.1968). In that case the Texas court, without departing from the common-law rule, held that a landlord's reentry in the tenant's absence by picking the locks and locking the tenant out, although accomplished without actual violence, was forcible as a matter of law.[5] The Texas courts, by continuing to embrace the common-law rule, have apparently left open the possibility that self-help may be available in that state to dispossess a tenant in some undefined circumstances which may be found peaceable.

We recognize that the growing modern trend departs completely from the common-law rule to hold that self-help is never available to dispossess a tenant who is in

---

**5.** California courts similarly implied force in certain nonviolent entries made in the tenant's absence. See, e. g., *Karp v. Margolis,* 159 Cal. App.2d 69, 323 P.2d 557 (1958); *McNeil v. Higgins,* 86 Cal.App.2d 723, 195 P.2d 470 (1948).

possession and has not abandoned or voluntarily surrendered the premises. Annotation, 6 A.L.R.3d 177, 186; 76 Dickinson L.Rev. 215, 227. This growing rule is founded on the recognition that the potential for violent breach of peace inheres in any situation where a landlord attempts by his own means to remove a tenant who is claiming possession adversely to the landlord. Courts adopting the rule reason that there is no cause to sanction such potentially disruptive self-help where adequate and speedy means are provided for removing a tenant peacefully through judicial process. At least 16 states[6] have adopted this modern rule, holding that judicial proceedings, including the summary procedures provided in those states' unlawful detainer statutes, are the exclusive remedy by which a landlord may remove a tenant claiming possession. See, e. g., *Kassan v. Stout,* 9 Cal.3d 39, 106 Cal.Rptr. 783, 507 P.2d 87 (1973); *Jordan v. Talbot,* 55 Cal.2d 597, 12 Cal.Rptr. 488, 361 P.2d 20 (1961); *Malcolm v. Little,* 295 A.2d 711 (Del.1972); *Teston v. Teston,* 135 Ga.App. 321, 217 S.E.2d 498 (1975); *Weber v. McMillan,* 285 So.2d 349 (La.App. 1973); *Bass v. Boetel & Co.,* 191 Neb. 733, 217 N.W.2d 804 (1974); *Edwards v. C. N. Investment Co.,* 27 Ohio Misc. 57, 56 Ohio O.2d 261, 272 N.E.2d 652 (1971).[7]

■ While we would be compelled to disapprove the lockout of Berg in her absence

under the common-law rule as stated, we approve the trial court's reasoning and adopt as preferable the modern view represented by the cited cases. To make clear our departure from the common-law rule for the benefit of future landlords and tenants, we hold that, subsequent to our decision in this case, the only lawful means to dispossess a tenant who has not abandoned nor voluntarily surrendered but who claims possession adversely to a landlord's claim of breach of a written lease is by resort to judicial process. We find that Minn.St. 566.02 to 566.17 provide the landlord with an adequate remedy for regaining possession in every such case.[8] Where speedier action than provided in §§ 566.02 to 566.17 seems necessary because of threatened destruction of the property or other exigent circumstances, a temporary restraining order under Rule 65, Rules of Civil Procedure, and law enforcement protection are available to the landlord. Considered together, these statutory and judicial remedies provide a complete answer to the landlord. In our modern society, with the availability of prompt and sufficient legal remedies as described, there is no place and no need for self-help against a tenant in claimed lawful possession of leased premises.

Applying our holding to the facts of this case, we conclude, as did the trial court,

---

6. Annotation, 6 A.L.R.3d 177, 186, Supp. 13, shows this modern rule to have been adopted in California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Nebraska, North Carolina, Ohio, Tennessee, Texas, Utah, Vermont, and Washington.

7. We have examined the summary statutory procedures for repossession held exclusive in these other states and we find them comparable and on the whole no speedier than the summary judicial procedures by which a landlord may regain possession in as little as 3 to 10 days under Minn.St. 566.02 to 566.17.

8. Under §§ 566.05 and 566.06, a landlord may regain possession in default proceedings against a tenant personally served with process in as little as 3 to 10 days. Default judgment against a tenant not present and served by posting may be procured in a week to 10 days. §§ 566.05 and 566.06. Trial is by the court unless either party demands a jury trial. § 566.07. Proceedings are stayed on appeal

except as against a holdover tenant. § 566.12. Upon execution of a writ of restitution, the tenant is allowed 24 hours to vacate the property.

We are mindful that by § 566.04 the summary remedy of §§ 566.02 to 566.17 is made unavailable against any tenant having been "in quiet possession for three years next before the filing of the complaint * * *." This reflects an appropriate policy choice by the legislature to require full litigation of the right to possession in a common-law ejectment action before judicially ousting a tenant of such long tenure. Our holding, disallowing self-help in such cases as well, is consistent with the legislative policy protecting the long-term tenant. The availability of temporary restraining orders, temporary injunctions against waste, and eventual damages for unlawful detainer or unpaid rent provides an adequate compensating remedy to the landlord for any delay in obtaining possession during judicial proceedings.

that because Wiley failed to resort to judicial remedies against Berg's holding possession adversely to Wiley's claim of breach of the lease, his lockout of Berg was wrongful as a matter of law. The rule we adopt in this decision is fairly applied against Wiley, for it is clear that, applying the older common-law rule to the facts and circumstances peculiar to this case, we would be compelled to find the lockout nonpeaceable for the reasons previously stated. The jury found that the lockout caused Berg damage and, as between Berg and Wiley, equity dictates that Wiley, who himself performed the act causing the damage, must bear the loss.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.